# United States Court of Appeals for the Fifth Circuit

---

No. 22-50732

---

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2024

Lyle W. Cayce
Clerk

Mɪ Fᴀᴍɪʟɪᴀ Vᴏᴛᴀ; Mᴀʀʟᴀ Lᴏᴘᴇᴢ; Mᴀʀʟᴏɴ Lᴏᴘᴇᴢ; Pᴀᴜʟ Rᴜᴛʟᴇᴅɢᴇ,

*Plaintiffs—Appellees*,

*versus*

Kɪᴍ Oɢɢ,

*Defendant—Appellant*,

---

OCA-Gʀᴇᴀᴛᴇʀ Hᴏᴜsᴛᴏɴ; Lᴇᴀɢᴜᴇ ᴏғ Wᴏᴍᴇɴ Vᴏᴛᴇʀs ᴏғ Tᴇxᴀs; REVUP-Tᴇxᴀs,

*Plaintiffs—Appellees*,

*versus*

Jᴏsᴇ A. Esᴘᴀʀᴢᴀ, *In His Official Capacity as Texas Secretary of State (Acting)*; Eᴛ ᴀʟ.,

*Defendants*,

Kɪᴍ Oɢɢ,

*Appellant*,

---

LULAC TEXAS; VOTE LATINO; TEXAS ALLIANCE FOR RETIRED
AMERICANS; TEXAS AFT,

*Plaintiffs—Appellees,*

*versus*

JOSE ESPARZA; ET AL.,

*Defendant,*

KIM OGG,

*Appellant,*

————————

DELTA SIGMA THETA SORORITY, INCORPORATED; HOUSTON
AREA URBAN LEAGUE; THE ARC OF TEXAS; JEFFREY LAMAR
CLEMMONS,

*Plaintiffs—Appellees,*

*versus*

GREGORY WAYNE ABBOTT, *In His Official Capacity as the Governor of
Texas*; ET AL.,

*Defendants,*

KIM OGG,

*Appellant,*

————————

MI FAMILIA VOTA; MARLA LOPEZ; MARLON LOPEZ; PAUL
RUTLEDGE,

*Plaintiffs—Appellees,*

*versus*

GREG ABBOTT, *In His Official Capacity as Governor of Texas*; ET AL.,

*Defendants*,

KIM OGG,

*Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:21-CV-780, 1:21-CV-786,
5:21-CV-844, 5:21-CV-848, 5:21-CV-920

_____

Before RICHMAN, *Chief Judge*, and SOUTHWICK, and OLDHAM, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

This is an interlocutory appeal from the district court's denial of a motion to dismiss. The Plaintiffs are civil rights groups, voters, and an election official. They seek to enjoin recent amendments to Texas's election code, alleging that those amendments violate the United States Constitution and several federal statutes. The Defendant is the District Attorney for Harris County who is sued in her official capacity. The district court denied the District Attorney's motion to dismiss, holding that she is not immune from the Plaintiffs' constitutional claims. The district court also found the Plaintiffs have standing to bring their claims against the District Attorney. We hold that we have jurisdiction to hear this appeal and that the district court should have dismissed the Plaintiffs' constitutional claims as barred by sovereign immunity. We do not reach the issue of standing. We REVERSE in part, VACATE in part, and REMAND for further proceedings.

No. 22-50732

## FACTUAL AND PROCEDURAL BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021. The enactment is generally known by its Texas Senate bill number, "S.B. 1." *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (Tex. 2021). S.B. 1 modified various provisions of the Texas Election Code concerning voting, early voting, voting by mail, and voter assistance. *See id.* S.B. 1 also modified some existing elections-related criminal statutes and created several new ones. *See, e.g.*, Tex. Elec. Code § 33.051(g) (making it an offense for an election officer intentionally or knowingly to refuse to accept a poll watcher as required by law); § 276.015(b)–(d) (criminalizing "vote harvesting").

Several advocacy groups and others filed lawsuits challenging S.B. 1's constitutionality. They alleged certain provisions violate federal statutes including the Voting Rights Act of 1965 ("VRA"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. These suits were consolidated on September 30, 2021. The advocacy groups alleged S.B. 1's restrictions would impact their ability to advance their respective missions and their members' ability to vote and to assist others with voting.

The complaints originally named various state and county officials as defendants, including Texas Attorney General Ken Paxton. Section 273.021(a) of the Texas Election Code authorized the Attorney General to enforce election-related criminal statutes, including those established by S.B.1.

On December 15, 2021, the Texas Court of Criminal Appeals held that Section 273.021 violated the separation of powers clause of the Texas constitution and was therefore unconstitutional. *State v. Stephens*, 663 S.W.3d 45, 51–54 (Tex. Crim. App. 2021) (citing Tex. Const. art. II, § 1). The court concluded the Texas constitution "grants . . . authority to county

and district attorneys" to "[r]epresent[] the state in a criminal prosecution for election law violations," and described this authority as "the specific duty of county and district attorneys." *Id.* at 52 (citing TEX. CONST. art. V, § 21). It explained that "the Attorney General can prosecute with the permission of the local prosecutor but cannot initiate prosecution unilaterally." *Id.* at 55.

Three Plaintiffs groups — the LULAC Plaintiffs,[1] MFV Plaintiffs,[2] and OCA Plaintiffs[3] (collectively, "Plaintiffs") — responded to *Stephens* by amending their complaints to add several district attorneys as defendants, including Kim Ogg, the Harris County District Attorney. The Plaintiffs challenged several S.B. 1 provisions and alleged that Ogg is a proper defendant for their claims under the First, Fourteenth, and Fifteenth Amendments of the United States Constitution, Sections 2 and 208 of the VRA, Title II of the ADA, and Section 504 of the Rehabilitation Act.

Ogg offered the Plaintiffs a "stipulation" or "non-participation agreement" under which she would refrain from enforcing the challenged criminal provisions "until such time as a final, non-appealable decision has been issued in this matter." The Plaintiffs rejected the stipulation, arguing on appeal that the "limited offer did not bind Ogg to any final ruling on the merits; require her to produce discovery in the case; or impact her statutory duty to aid the Attorney General when called upon to help investigate

---

[1] This group includes LULAC Texas, Voto Latino, Texas Alliance for Retired Americans, and Texas AFT.

[2] This group includes Mi Familia Vota, Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Marla Lopez, Marlon Lopez, Paul Rutledge, and Jeffrey Lamar Clemmons.

[3] This group includes OCA-Greater Houston, League of Women Voters of Texas, REVUP-Texas, Texas Organizing Project, and Workers Defense Action Fund.

election infractions." The Plaintiffs also complain the stipulation did not "rule out her granting permission to Attorney General Paxton to bring prosecutions under S.B. 1 within her jurisdiction."

Ogg moved to dismiss all claims brought against her under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The motion included assertions of sovereign immunity and a lack of standing. The district court granted the motion in part and denied it in part.[4] The court allowed the Plaintiffs to proceed against Ogg with challenges to the criminal provisions of S.B. 1 but dismissed claims that sought to challenge election code provisions that impose only civil penalties.[5] The court held sovereign immunity did not bar the Plaintiffs' claims under the exception carved out in *Ex parte Young*, 209 U.S. 123 (1908). The district court likewise held the Plaintiffs had standing to assert their claims against Ogg.

Ogg filed a notice of appeal. She also moved to stay discovery and further proceedings against her. The district court denied the motion to stay. Ogg then sought a stay in this court. In an unpublished order, a panel of this court denied Ogg's motion on October 7, 2022. The panel held that Ogg failed to justify a stay because she had "no likelihood of succeeding on the merits" on her sovereign immunity defense to the Plaintiffs' VRA claims "because the VRA explicitly abrogated sovereign immunity." The panel

---

[4] In separate orders, the district court also granted in part and denied in part the motion to dismiss filed by the State of Texas, the Governor, the Secretary of State, and the Attorney General. Appeals from those orders were consolidated under case number 22-50775. The appeal before us relates only to the district court's order denying Ogg's motion.

[5] Specifically, the district court allowed the Plaintiffs' claims to proceed with respect to Sections 4.06, 4.09, 6.04, 6.05, 6.06, 7.02, and 7.04 of S.B. 1, which extend to Sections 276.015, 276.016, 276.017, and 276.018 of the election code. All these provisions "create or implicate one or more criminal offenses" or "contemplate criminal offenses" under the election code. Our decision is limited to these provisions.

No. 22-50732

further "decline[d] Ogg's invitation to prematurely review [her] pleading and standing arguments at the motions stage of an interlocutory appeal concerning a wholly separate sovereign immunity issue."

## DISCUSSION

There are three issues presented in this interlocutory appeal: (1) whether we have jurisdiction under the collateral order doctrine to review the district court's denial of sovereign immunity as it relates to some, but not all, of the Plaintiffs' claims; (2) whether the district court erred in denying Ogg's motion to dismiss the Plaintiffs' constitutional claims based on sovereign immunity and the Eleventh Amendment; and (3) whether the Plaintiffs have standing to assert their statutory claims. Because of our resolution of the first two issues, we need not reach the third.

We will start our analysis with examining our jurisdiction over the appeal. Because we find there is jurisdiction, we then apply *de novo* review to the district court's dismissal under Rule 12(b)(1) for a lack of jurisdiction in that court. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). In doing so, "we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Id.* "The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction." *Greiner v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (citation omitted).

*I.    Appellate jurisdiction to review the denial of sovereign immunity*

Federal appellate jurisdiction is generally limited to review of "final decisions of the district courts of the United States." 28 U.S.C. § 1291. This appeal is not from a final decision but from an order that rejected a sovereign-immunity bar to the Plaintiffs' constitutional claims against Ogg. Ogg invokes the collateral order doctrine on appeal as a basis for our jurisdiction.

No. 22-50732

We must first conclude we have jurisdiction before considering the merits of this appeal. *BancPass, Inc. v. Highway Toll Admin., LLC*, 863 F.3d 391, 397 (5th Cir. 2017). Under the collateral order doctrine, we may hear "interlocutory appeals from a small category of decisions that, although they do not end the litigation, must nonetheless be considered final." *Id.* (citation omitted). This narrow doctrine applies only to decisions that (1) are not "tentative, informal or incomplete," (2) "deal[] with 'claims of right *separable* from, and collateral to, rights asserted in the action,'" (3) are "effectively unreviewable on the appeal from final judgment," and (4) are "too important to be denied review." *Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470, 490–91 (5th Cir. 2001) (emphasis in original) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). These requirements are demanding. *See In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

The Plaintiffs argue we lack jurisdiction because Ogg's sovereign immunity defense, at most, could apply only to the Plaintiffs' constitutional claims. The Plaintiffs brought statutory claims under the VRA, Section 504 of the Rehabilitation Act, and Title II of the ADA, all of which allegedly waive sovereign immunity. We agree that at least the VRA includes a waiver of sovereign immunity, as precedent of this court has so held.[6] The Plaintiffs contend jurisdiction over an interlocutory appeal exists only when immunity from an entire suit exists, not from specific claims, citing *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993), and *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442 (5th Cir. 2022). The Plaintiffs argue the "piecemeal nature of Ogg's immunity defense undercuts any basis for collateral order review." We examine this interpretation.

---

[6] This court held that Congress enacted the VRA under "its Fifteenth Amendment enforcement power, [thereby] validly abrogating state sovereign immunity." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

No. 22-50732

A.     *Review of the factors governing interlocutory appeals*

We start our review by discussing what the collateral order doctrine demands.  Understanding why a denial of sovereign immunity from an entire suit is reviewable on interlocutory appeal can help us evaluate appeals from less-than-complete immunity decisions.

We earlier enumerated the factors that govern our decision.  The first is satisfied, as an order denying sovereign immunity is not tentative.  It marks the point at which a court informs the State it must defend itself.  *See Metcalf & Eddy*, 506 U.S. at 145.  Even if the denial is of immunity from only one claim, there still is a definitive ruling.  *See Texas v. Caremark, Inc.*, 584 F.3d 655, 658 (5th Cir. 2009).

The second factor is also met, as sovereign immunity is a separate issue from the merits of a case.  Evaluating whether there is immunity from suit or a claim in no manner determines the merits of asserted claims, only whether they are assertable.  *See Metcalf & Eddy*, 506 U.S. at 145.

As to the third, a denial of an assertion of sovereign immunity that applies to an entire suit is reviewable on appeal after a final judgment, but the effectiveness of that review to protect the State's interest is minimal because a substantial part of the benefit of immunity has been lost.  The denial of immunity from some but not all claims potentially imposes on the State an erroneously broad obligation of defense that must be endured before the error is corrected on appeal.  *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 258 (2011).  Jurisdictional issues like the immunity the Eleventh Amendment represents "are founded in concern about the proper — and properly limited — role of the courts in a democratic society."  *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quotation marks and citation omitted).  A federal court exercising jurisdiction over a claim to which a State is immune, even if other, non-immune claims exist, at least

increases the coercive process exercised by the federal court. *Cf. Lee v. Anthony Lawrence Collection, LLC*, 47 F.4th 262, 267–68 (5th Cir. 2022).

The fourth and final factor, namely, the State's interest in immunity *from suit*, is a significant interest justifying an interlocutory appeal. *See Metcalf & Eddy*, 506 U.S. at 146. Whether the State's interest in possible immunity from only some claims but not others is significant enough to justify review under the collateral order doctrine is an issue we will consider later in the opinion.

Thus, the general considerations for allowing interlocutory appeals give meaningful support to allowing an appeal from the denial of sovereign immunity over some but not all claims. We now examine caselaw to see if there are comparable appeals that have been allowed.

## B.    *Relevant caselaw*

In one precedent on which the Plaintiffs rely, the Supreme Court held that an interlocutory order denying a state agency's claim of immunity from suit could be appealed as a collateral order. *Metcalf & Eddy*, 506 U.S. at 141. The Court reasoned the Eleventh Amendment "effectively confers an immunity from suit" such that, "[a]bsent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court." *Id.* at 144 (quotation marks and citation omitted). Therefore, when district courts reject States' or state entities' claims to immunity signified by the Eleventh Amendment, those rulings are "conclusive determinations that they have no right not to be sued in federal court." *Id.* at 145. For that reason, immediate appeal under the collateral order doctrine is permitted. *Id.* at 147. It is true that the Court referred to whether a state governmental entity is "*subject to suit* in federal court." *Id.* at 144 (emphasis added). Nonetheless, the issue of appealability of denials of claims to immunity only from some claims did not

exist in that case.  We must look further to determine whether we have jurisdiction over this appeal.

In another precedent, two Planned Parenthood entities and three individuals sued the Louisiana Department of Health, alleging the Department unlawfully declined to act on a license application to provide abortion services.  *Planned Parenthood Gulf Coast*, 24 F.4th at 445.  There were two claims:  one regarding the Department's failure to act on the application and another regarding a Louisiana state law that prohibited "giving taxpayer funds, including Medicaid funds, to abortion providers."  *Id.* at 446–47.  The district court denied the motions to dismiss based on sovereign immunity.  *Id.* at 447–48.

In this court, the Department insisted "it has always asserted 'immunity from suit,'" responding to the plaintiffs' argument that in district court, it had asserted more limited immunity.  *Id.* at 448–49.  It is in this context that we held there was collateral order jurisdiction "because the Department asserted sovereign immunity from this entire lawsuit."  *Id.* at 450.  We held that a State does not need to assert sovereign immunity independently over each claim.  *Id.* at 450.  The "jurisdictional inquiry is not overly technical" and we ask only whether "the state assert[s] sovereign immunity from suit."  *Id.* at 449.  Therefore, our analysis in that opinion could pretermit considering any issue of jurisdiction if the State had actually asserted less than complete immunity.  Concluding that complete immunity had been claimed, we had no reason to address whether collateral order jurisdiction also existed when sovereign immunity is asserted for fewer than all claims.

There is some language in the opinion suggesting we should not accept the current appeal.  For example, we referred to one of our precedents as characterizing that "a proper invocation of sovereign immunity will be from the 'entire suit.'"  *Id.* (quoting *McCarthy ex rel. Travis v. Hawkins*, 381

No. 22-50732

F.3d 407, 411 (5th Cir. 2004)).    In *McCarthy*, though (as in *Planned Parenthood*), the defendants had asserted sovereign immunity from the entire suit.  *See McCarthy*, 381 F.3d at 411.  Thus, in neither case did this court need to decide the right to appeal from the denial of immunity asserted on fewer than all claims.

Further, there is some suggestion in *Planned Parenthood* that a State does not need to insist on immunity from all claims before the collateral order doctrine will apply. The court stated that "[t]his is not the first time that we have exercised jurisdiction over an interlocutory appeal where the state asserted absolute immunity from only some, and not all, of a plaintiff's claims in the district court." *Planned Parenthood Gulf Coast*, 24 F.4th at 450 n.13. The court then described *BancPass* as the relevant precedent. *Id.*  That case arose "out of litigation between rival companies that specialize in highway toll collection technology." *BancPass*, 863 F.3d at 394.  One of those *private companies* asserted absolute immunity from a defamation claim because the allegedly defamatory communications were absolutely privileged as part of judicial proceedings under Texas law.  *Id.* at 396.  It did not assert any immunity from the plaintiff's other claim of tortious interference with contract. *Id.* at 397–98.  We allowed an interlocutory appeal even though it was only from the ruling on the defamation claim. *Id.* at 398.

We conclude that *Planned Parenthood* made no clear holding about the need for complete immunity before the collateral order doctrine could be invoked for an appeal.  Whatever that opinion or *McCarthy* did hold on the issue would at most be *dicta* because that was not the issue those courts faced.

We next examine opinions from other circuits cited by the parties.  In a Ninth Circuit case, the State of Hawaii appealed the district court's denial of its motion for partial summary judgment, claiming the Eleventh Amendment shielded it from exposure to punitive damages under Title II of the

No. 22-50732

ADA and Section 504 of the Rehabilitation Act. *Burns-Vidlak ex rel. Burns v. Chandler*, 165 F.3d 1257, 1258–59 (9th Cir. 1999). The court held it did not have collateral order jurisdiction because, unlike in *Metcalf & Eddy*, "the State [wa]s not claiming sovereign immunity from suit." *Id.* at 1260. Instead, Hawaii acknowledged it was subject to suit in federal court on some claims but sought a ruling that punitive damages were not recoverable. *Id.* "The foundation for the interlocutory appeal authorized by [*Metcalf & Eddy*] is the existence of a right not to be a litigant . . . . Once the [state] defendants concede that the litigation is proper, they undermine any claim of entitlement to an interlocutory appeal." *Id.* at 1261 (alterations in original) (quoting *Mercer v. Magnant*, 40 F.3d 893, 896–97 (7th Cir. 1994)). The quoted Seventh Circuit opinion also denied the right to bring an interlocutory appeal when the claim was not immunity from suit, but only immunity from one form of relief — damages. *Mercer*, 40 F.3d at 897.

Hawaii's interlocutory appeal brought a far narrower issue than is made here, arguing only that a particular form of relief was unavailable even though the claims themselves were properly brought. Here, the argument is that the constitutional claims, and necessarily *any* form of relief for those claims, are barred by sovereign immunity. We see that as a valid distinction, but we also acknowledge the Ninth Circuit's language emphasizes the need to seek enforcement of "a right not to be a litigant." *Burns-Vidlak*, 165 F.3d at 1261 (quoting *Mercer*, 40 F.3d at 896). This opinion is certainly helpful to the Plaintiffs but is not binding on us.

We interpret the analysis in a First Circuit opinion as being analogous to that in the Ninth Circuit opinion we just discussed. *See Espinal-Dominguez v. Com. of Puerto Rico*, 352 F.3d 490 (1st Cir. 2003). There, the plaintiff sued Puerto Rico under Title VII for discrimination, seeking monetary compensation. *Id.* at 493; 42 U.S.C. §§ 2000e to 2000e–17. The defendant argued that the Eleventh Amendment barred damages but conceded it was subject to suit

for the underlying claims because Title VII constituted a valid abrogation of state sovereign immunity. *Espinal-Dominguez*, 352 F.3d at 493–94. The First Circuit held "[t]his concession . . . opened the Eleventh Amendment portal at least part-way" and divested the court of appellate jurisdiction over the interlocutory appeal. *Id.* at 494, 499. The First Circuit also noted the "foundation for the interlocutory appeal authorized by [*Metcalf & Eddy*] is the existence of the right not to be a litigant," and recognized that appellate jurisdiction in this circumstance "would require an extension of the holding announced" in that case. *Id.* at 496–97 (citation omitted).

None of this caselaw addressed as a relevant issue whether a State defendant who did not assert sovereign immunity from all claims could appeal from a denial of that partial immunity. We consider it necessary, then, to look beyond authority that discusses only the Eleventh Amendment. We do so now.

## C.    *Appeals from denial of other forms of immunity*

In addition to permitting interlocutory appeals under the collateral order doctrine from denials of sovereign immunity, the Supreme Court has allowed interlocutory appeals of orders rejecting absolute immunity, *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982); qualified immunity, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); and a defense of double jeopardy for criminal defendants, *Abney v. United States*, 431 U.S. 651, 660 (1977). Qualified immunity is the only category of immunity for which the Court has addressed whether an appeal may be taken from its denial even when other claims will not be affected. *See Behrens v. Pelletier*, 516 U.S. 299 (1996). That immunity is available only to individuals, not to the State, but we consider the Court's analysis to be relevant.

The Court considered the argument that denial of qualified immunity should not be appealable immediately because "the defendant will be

No. 22-50732

required to endure discovery and trial on matters separate from the claims against which immunity was asserted." *Id.* at 311. The Court explained that in the context of qualified immunity, the "right to immunity is a right to immunity *from certain claims*, not from litigation in general; when immunity with respect to those claims has been finally denied, appeal must be available, and cannot be foreclosed by the mere addition of other claims to the suit." *Id.* at 312 (emphasis in original).

This court also has found collateral order jurisdiction in appeals from denials of qualified immunity that had been asserted over only some claims. *See, e.g.*, *Waller v. Hanlon*, 922 F.3d 590, 598 (5th Cir. 2019). At other times, the application of qualified immunity will constitute "immunity from suit" that "is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

In *Behrens* as to qualified immunity, the Supreme Court made its only clear recognition of a right to appeal the denial of an immunity when asserted as to fewer than all claims. Even so, across the range of immunities, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). That has been expressed when addressing qualified immunity claims, *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), and sovereign immunity claims, *In re Paxton*, 60 F.4th 252, 257 (5th Cir. 2023). Further, a purpose of both sovereign immunity and qualified immunity is to protect defendants from the burden, expense, and disruption of litigation. *See Metcalf & Eddy*, 506 U.S. at 146 & n.5; *Behrens*, 516 U.S. at 308. Protecting defendants from some of the expenses and burdens, even if not all, has merit.

D.     *The costs and consequences of litigation*

Ogg contends the denial of sovereign immunity here would have consequences "in terms of real costs and litigation burdens on state officials, not

to mention courts," where, as here, "some plaintiffs have sought expansive discovery from . . . [her] and her office." She highlights the district court's "willingness to permit such expansive discovery" and argues this would "force local prosecutors to redirect resources." The Plaintiffs respond that, because Ogg may be subject to the costs and consequences of litigation through the Plaintiffs' statutory claims, her claims to sovereign immunity are undermined and we therefore lack jurisdiction.

Although both parties correctly highlight the costs and consequences of litigation when considering whether sovereign immunity applies, the Eleventh Amendment's purpose is not solely or even primarily fiscal. "The very object and purpose of the [E]leventh [A]mendment were to prevent the indignity of subjecting a [S]tate to the coercive process of judicial tribunals at the instance of private parties." *Ex parte Ayers*, 123 U.S. 443, 505 (1887). Thus, burdens and expenses of litigation are a consideration, but the "ultimate justification" for the Eleventh Amendment "is the importance of ensuring that the States' dignitary interests can be fully vindicated." *Metcalf & Eddy*, 506 U.S. at 146.

For this reason, the Supreme Court rejected the First Circuit's attempt to distinguish sovereign immunity from qualified immunity under the collateral order doctrine "on the grounds that the States, as compared to individual officials, are better able to bear the burden of litigation." *Id.* at 146 n.5. The Court reasoned that "[t]he Eleventh Amendment is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued." *Id.* Likewise, the continued expenses Ogg might face on Plaintiffs' statutory claims is not the primary focus of the Eleventh Amendment. It is her privilege not to be sued over claims from which she is immune.

The Supreme Court has "repeatedly stressed" that the collateral order doctrine is a "'narrow' exception" that should "never be allowed to

No. 22-50732

swallow the general rule that a party is entitled to a single appeal." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). The Supreme Court has also "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227. We must balance these important directions.

We conclude that recognizing jurisdiction in this case under the collateral order doctrine is appropriate. Even though Ogg argues for the protections that arise from the Eleventh Amendment only as to part of the lawsuit, we have jurisdiction to rule on those arguments.

## II.     *Sovereign immunity over the Plaintiffs' constitutional claims*

We now examine the merits of Ogg's sovereign immunity defense to the Plaintiffs' constitutional claims.

"Generally, state sovereign immunity precludes suits against state officials in their official capacities." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020) ("*Texas Democratic Party I*"). The legal fiction of *Ex parte Young*, however, provides an "exception to Eleventh Amendment sovereign immunity" in the subset of cases to which it applies. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). The exception permits federal courts to enjoin prospective unconstitutional conduct by "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature." *Ex parte Young*, 209 U.S. at 155–56.

The *Ex parte Young* exception has three requirements: "(1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (*en banc*)

No. 22-50732

(quotation marks and citations omitted). Ogg does not dispute that the Plaintiffs meet these general requirements. Instead, the parties dispute whether Ogg is the correct defendant.

To be a proper defendant under *Ex parte Young*, a state official "must have some connection with the enforcement of" the law being challenged. *Ex parte Young*, 209 U.S. at 157. We once expressed that "[o]ur decisions are not a model of clarity on what constitutes a sufficient connection to enforcement." *Texas Democratic Party I*, 961 F.3d at 400 n.21 (quotation marks and citation omitted). Still, there are "guideposts" to aid the decision. *Texas All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). They are: (1) the state official has "more than the general duty to see that the laws of the state are implemented," *i.e.*, a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law." *Id.* (quotation marks and citation omitted).[7]

We will assess each guidepost.

### A.    *Ogg's duty to enforce the challenged provisions*

A state official may be "specially charged with the duty to enforce [a] statute." *Ex parte Young*, 209 U.S. at 158. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." *City of Austin*, 943 F.3d at

---

[7] Our *Texas Alliance* opinion expressed this formulation somewhat differently by placing the "particular duty" requirement as part of the second "guidepost" alongside the "demonstrated willingness" requirement. *Texas All.*, 28 F.4th at 672. That reordering is not legally significant. *See id.* at 672–74. Instead, we consider the duties requirements together by first assessing Ogg's enforcement duty and then analyzing her demonstrated willingness to exercise that duty. *See City of Austin*, 943 F.3d at 999–1000.

998. The statutory text does not need to "state the official's duty to enforce it, although such a statement may make that duty clearer." *Id.* at 997–98. "A general duty to enforce the law is insufficient." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020) ("*Texas Democratic Party II*").

We earlier mentioned the Texas Court of Criminal Appeals' 2021 decision that discussed the enforcement of S.B. 1. *Stephens*, 663 S.W.3d 45. The court held that Texas Election Code Section 273.021, which gave the Attorney General independent authority to bring criminal prosecutions, violated the state constitution's separation of powers. *Id.* at 51–57. The court explained that the Texas constitution gives county and district attorneys the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the state constitution. *Id.* at 55–56. It was therefore a violation of separation of powers for the legislature to delegate such prosecutorial power to the Attorney General. *Id.* at 55–57.[8]

The district court read *Stephens* as holding that "only local district attorneys have independent authority to prosecute criminal offenses under the Election Code." Because the Texas Election Code specifically contemplates the district attorneys' involvement in criminal prosecutions of code violations, "[t]ogether, the language of the Election Code and *Stephens* confirm that county and district attorneys have authority to compel or constrain a person's ability to violate" the challenged S.B. 1 provisions.

Ogg agrees that she has *authority* to enforce the relevant provisions of law that the Plaintiffs challenge. She argues she has no *duty* to bring any

---

[8] The pronouncements of the Texas Court of Criminal Appeals on state criminal law are authoritative in this court, equal to the respect we give holdings by the Supreme Court of Texas on civil law. *See Arnold v. Cockrell*, 306 F.3d 277, 279 (5th Cir. 2002).

No. 22-50732

prosecutions; instead, she has "complete discretion" over whether to bring criminal charges, which is distinct from the "specific duty" required for *Ex parte Young* to apply. As support, she cites Texas Code of Criminal Procedure Article 2.01, which states that "[i]t shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done." Ogg is correct that mere authority is not enough. *See Texas Democratic Party II*, 978 F.3d at 181.

The Plaintiffs argue Ogg does, in fact, have a "specific duty" to enforce the Texas Election Code. They rely on *Stephens*, which characterized the exclusive authority of district attorneys to bring criminal prosecutions as a "specific duty." *Stephens*, 663 S.W.3d at 52. Examining that section of *Stephens*, we see that the court was distinguishing the Attorney General from local prosecutors. *Id.* The court held there was no "specific grant of authority" in the Texas constitution to the Attorney General for "the prosecution of criminal proceedings," as the "[c]onstitution already grants this authority to county and district attorneys. *See* Tex. Const. art. V, § 21. Because this is already the specific duty of county and district attorneys," it was not a specific duty of the Attorney General. *Id.*

When the Court of Criminal Appeals referred to local prosecution of crime as the "specific duty" of officials like Ogg, it was not using that phrase in the same sense as our *Ex parte Young* precedent. Our analysis under *Ex parte Young* is essentially the reverse. That is, our analysis is "'provision-by-provision': The officer must enforce 'the particular statutory provision that is the subject of the litigation.'" *Texas All.*, 28 F.4th at 672 (quoting *Texas Democratic Party II*, 978 F.3d at 179). Reading *Stephens*'s "specific duty" language as satisfying *Ex parte Young*'s connection requirement would make district attorneys the proper defendants in challenges to *all* criminal statutes categorically. Our precedent demands more from a state statute.

No. 22-50732

Discretionary authority to act, on its own, is insufficient to give rise to a particular duty to act, *i.e.*, a "sufficient connection [to] enforcement." *City of Austin*, 943 F.3d at 998 (alteration in original) (quoting *Ex parte Young*, 209 U.S. at 157). The Plaintiffs counter that the Supreme Court's decision in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), dictates that authority to enforce alone, even if discretionary, is sufficient to overcome sovereign immunity. Specifically, the Plaintiffs quote language, joined only by a plurality of Justices, that *Ex parte Young* applied to state officials "who *may or must* take enforcement actions against the petitioners." *Whole Woman's Health*, 595 U.S. at 45 (emphasis added). The Plaintiffs suggest the "may or must" language of the plurality changes our precedent regarding the scope of the enforcement connection required under *Ex parte Young*.

Of course, the portion of the Supreme Court's decision on which the Plaintiffs rely did not gain a majority of the Court. *Id.* We may not overrule one of this court's precedents unless "such overruling is unequivocally directed by controlling Supreme Court precedent." *In re Tex. Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 331 (5th Cir. 2013) (quoting *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 648 (5th Cir. 2012) (Dennis, J., specially concurring)). Four other Justices did agree the suit in *Whole Woman's Health* could continue against certain state licensing officials "who retain authority to enforce" the challenged statute. *Whole Woman's Health*, 595 U.S. at 59–60 (Roberts, C.J., joined by Breyer, Sotomayor, and Kagan, JJ., concurring in the judgment in part and dissenting in part). These Justices concurred only in the judgment, not the reasoning, of the plurality, and there is no commonality between those opinions that would allow us, much less unequivocally direct us, to overrule our binding precedents. *See Drive Fin. Servs., LP v. Jordan*, 521 F.3d 343, 349–50 (5th Cir. 2008).

In addition, the Plaintiffs' reliance on *Whole Woman's Health* is misplaced: the statutes in that case purporting to grant state officials authority

No. 22-50732

to enforce the challenged laws were markedly different from what is at issue here. Even when the Supreme Court expresses a rationale that does not command a majority, we treat the Court's *holding* as binding "in cases presenting an essentially indistinguishable factual scenario." *Id.* at 350. The factual scenarios between this case and *Whole Woman's Health* are readily distinguishable. In *Whole Woman's Health*, the eight Justices that agreed the plaintiffs' suit could proceed relied on Texas Occupational Code Section 164.055(a) for their determinations that the state licensing officials, in the words of the plurality, "may or must take enforcement actions against" the plaintiffs if they violate the challenged statute. *Whole Woman's Health*, 595 U.S. at 45–46. The cited provision states that "[t]he board *shall* take an appropriate disciplinary action against a physician who violates" the statute that the plaintiffs challenged. Tex. Occ. Code § 164.055(a) (emphasis added).[9]

Here, there is no statute that commands Ogg to prosecute Texas Election Code violations. Instead, Ogg's authority to bring criminal prosecutions on behalf of the State is derived from the Texas constitution, as recognized in *Stephens*, 663 S.W.3d at 52, and from the Texas Code of Criminal Procedure, which states "[i]t shall be the primary duty of all prosecuting attorneys . . . to see that justice is done," Tex. Code Crim. P. art. 2.01.[10] Under Texas Occupational Code § 164.055(a), the specific duty of the licensing officials to take enforcement action was clear. Here, there is no such clarity.

---

[9] Under Texas law, "[t]he term 'shall,' . . . 'imposes a duty.'" *Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019) (quoting Tex. Gov't Code § 311.016(2)).

[10] Although we do not evaluate the terms of each challenged S.B. 1 provision, we are not departing from our approach to evaluate Ogg's enforcement connection "'provision-by-provision.'" *Texas All.*, 28 F.4th at 672 (quoting *Texas Democratic Party II*, 978 F.3d at 179). We are able to do so because the source of Ogg's purported enforcement connection is the same for all S.B. 1 provisions that create or implicate criminal punishment. Accordingly, our analysis is the same for each provision.

No. 22-50732

Finally, Texas law did *not* give the licensing officials authority to enforce the statute that was challenged in *Whole Woman's Health*. After the Supreme Court remanded the case to this court, we certified to the Supreme Court of Texas the question of whether state law authorized the named licensing officials to enforce the statute. *Whole Woman's Health v. Jackson*, 23 F.4th 380, 389 (5th Cir. 2022). The court answered that the licensing officials could *not* enforce the challenged statute because its "exclusive-enforcement provision" provided it could only be enforced through private civil actions. *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 576–77 (Tex. 2022). Accordingly, we remanded with instructions to dismiss all challenges to the private enforcement provisions. *Whole Woman's Health v. Jackson*, 31 F.4th 1004, 1006 (5th Cir. 2022).

In sum, "[t]o be amenable to suit under [*Ex parte Young*], the state actor must *both* possess the authority to enforce the challenged law and have a sufficient connection [to] the enforcement of the challenged act." *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (third alteration in original) (emphasis added) (quotation marks and citations omitted). Here, Ogg has discretionary authority to bring criminal prosecutions within her jurisdiction, including for violations of the Texas Election Code. This authority is not derived from that code itself but is rooted in the Texas constitution. Ogg has a general duty to "see that justice is done," Tex. Code Crim. P. art. 2.01, but that is not enough. *Texas All.*, 28 F.4th at 674.

In some prior Texas election law cases where we held the named defendant was not the proper *Ex parte Young* defendant, we identified those state officials who could be proper defendants under the doctrine. *See id.* at 672–73; *Ostrewich v. Tatum*, 72 F.4th 94, 100–01 (5th Cir. 2023); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020). We do not do so here because, as the Plaintiffs maintain, it may very well be that "no state official[] ha[s] a greater connection to the Criminal Provisions than district attorneys

No. 22-50732

like Ogg." The Plaintiffs therefore may reasonably wonder if not Ogg, then who?

Nevertheless, "as panels before us, we find that we need not define the outer bounds of this circuit's *Ex parte Young* analysis today." *City of Austin*, 943 F.3d at 1000. Instead, we analyze our other enforcement connection guideposts to confirm our conclusion that Ogg is not the proper *Ex parte Young* defendant.

### B.    *Ogg's willingness to enforce the challenged provisions*

Our second *Ex parte Young* enforcement connection guidepost is whether the official has a "demonstrated willingness" to enforce the challenged statute. *Texas All.*, 28 F.4th at 672 (citation omitted). This means "the state officials must have taken some step to enforce" the statute. *Texas Democratic Party I*, 961 F.3d at 401. In deciding how big the step must be, "the bare minimum appears to be 'some scintilla' of affirmative action by the state official." *Id.* (citation omitted). Such action may be shown through past enforcement of the statute. *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). If the plaintiffs bring a pre-enforcement action, as has occurred here, prior enforcement obviously will be lacking. Nevertheless, we still require "'some scintilla' of affirmative action by the state official." *Texas Democratic Party I*, 961 F.3d at 401 (citation omitted).

In finding the Plaintiffs met their burden on this guidepost, the district court applied our Article III standing analysis to the *Ex parte Young* issue. Specifically, the district court relied on our decision in *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020). There, we held that Speech First had associational standing to challenge the University of Texas at Austin's speech regulations. *Id.* at 330, 338. We stated that "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund)

statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 335 (quoting *New Hampshire Right to Life PAC v. Gardener*, 99 F.3d 8, 15 (1st Cir. 1996)). The district court relied on this statement to assert that a conclusion "that the Private Plaintiffs lack[] standing to challenge the provisions that create or implicate criminal offenses based on the purported absence of any enforcement of these laws *for now*, would improperly and permanently deprive the Private Plaintiffs of much-needed relief *later*." As part of their arguments on appeal, the Plaintiffs also rely on *Speech First* and other standing cases regarding the First Amendment.

As is clear on the face of the district court's decision, its analysis was focused on standing, not *Ex parte Young*'s enforcement connection requirement. We have previously highlighted the similarities between our *Ex parte Young* analysis and our Article III standing analysis.[11] *See City of Austin*, 943 F.3d at 1002. Nonetheless, they are "not identical." *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 394 n.5 (5th Cir. 2015).

Standing is the "irreducible constitutional minimum" for federal courts to exercise jurisdiction under Article III's "case" or "controversy" requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Sovereign immunity presents a common law barrier to the exercise of federal judicial power that predates Article III. *See Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991). The Eleventh Amendment reinforced this

---

[11] The "significant[] overlap" between standing and our *Ex parte Young* enforcement connection guideposts primarily rests with the traceability and redressability components of standing. *City of Austin*, 943 F.3d at 1002. Where, as here, a pre-enforcement action is brought seeking an injunction, our guideposts regarding a particular duty and a demonstrated willingness to enforce may also overlap with whether threatened injury is sufficiently imminent to support standing. *See id.*

barrier by forbidding federal courts from construing Article III to allow suits against the States without their consent. *See Alden v. Maine*, 527 U.S. 706, 722–23, 726–27 (1999). *Ex parte Young* was a judicial invention that provides a narrow pathway to overcome sovereign immunity that is necessary to guarantee "the effective supremacy of rights and powers secured elsewhere in the Constitution." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Perez v. Ledesma*, 401 U.S. 82, 106 (1971) (Brennan, J., concurring in part and dissenting in part)).

Our enforcement connection guideposts, on the other hand, help ensure that a defendant has "some connection with the enforcement of the act," in the absence of which the State becomes the real party, in violation of the Eleventh Amendment. *Ex parte Young*, 209 U.S. at 157. Thus, what is sufficient for standing will not necessarily establish an enforcement connection. Here, regardless of whether the record is sufficient to establish standing, it does not support the conclusion that Ogg has demonstrated a willingness to enforce the challenged election code provisions.

Ogg has taken no action with respect to the Texas Election Code provisions challenged by the Plaintiffs. Ogg never enforced the challenged provisions in the past, as this suit was brought only six days after the governor signed S.B. 1 and months before its provisions became effective. A history of prior enforcement is not required, especially in the pre-enforcement context that applies here. *See Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023). Nevertheless, the Plaintiffs must allege *some* action taken by Ogg to show a demonstrated willingness to enforce. *Texas Democratic Party I*, 961 F.3d at 401. The Plaintiffs have not done so.

Ogg argues she has demonstrated her *un*willingness to enforce S.B. 1 by offering to stipulate that she will not enforce the challenged criminal provisions until a final, non-appealable decision has been issued in this case. The

No. 22-50732

district court discounted Ogg's offer because an offer not to enforce "*for now*" would not prevent her from enforcing the statute "*later*" if the case were dismissed.  The Plaintiffs assert on appeal that Ogg's stipulation argument is meritless because the stipulation "was not agreed to by the parties" and is "severely limited in scope."

The district court's analysis and the Plaintiffs' argument regarding Ogg's stipulation focus on the wrong people at the wrong time.  We have discussed that the district court's analysis relied on our standing precedent, and its point about the stipulation is well taken in the standing context.  Our focus, however, is not on standing.  To determine whether an official has demonstrated a willingness to enforce a challenged statute, we consider the prior or contemporaneous affirmative acts of the named official.  *See, e.g.*, *K.P. v. LeBlanc*, 627 F.3d 115, 124–25 (5th Cir. 2010) (Board's prior enforcement of the statute); *NiGen*, 804 F.3d at 395 (Attorney General's letters threatening enforcement).  This is consistent with *Ex parte Young*'s foundational requirement that a violation of federal law be *ongoing*.  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  Although an "actual threat of or imminent enforcement is not required," *Calhoun*, 78 F.4th at 851 (quotation marks and citation omitted), *some* affirmative action on the part of the named defendant is, *Texas Democratic Party I*, 961 F.3d at 401.

For these reasons, the Plaintiffs' failure to accept Ogg's stipulation is irrelevant.  Our focus is on Ogg's prior or likely actions.  She has attested that she will not attempt to enforce the challenged provisions until this suit is over.  Although we have not ruled on this previously, other circuits have held that officials' attestations that they will not enforce a challenged statute while litigation over its constitutionality is ongoing sufficiently negates the charge

No. 22-50732

of a demonstrated willingness to enforce. *See, e.g.*, *Minnesota RFL Repub. Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 992 (8th Cir. 2022).[12]

The Plaintiffs' refusal to agree to Ogg's stipulation does not affect Ogg's promise not to enforce the challenged statutes. On appeal, Ogg continues to assert that she will abide by that promise. Similarly, a "failure to disavow future prosecutions" following litigation "is not fatal to [an official's] claim of Eleventh Amendment immunity." *Id.* Thus, although it may be relevant for standing, Ogg's failure to disavow prosecutions after this litigation concludes is not a basis for finding *Ex parte Young* applies.[13]

The Plaintiffs also argue that "Ogg is likely to enforce because the Attorney General and Secretary of State have significant control and influence over her enforcement discretion, and have threatened enforcement of the Criminal Provisions." The Plaintiffs cite several election code provisions that require the Attorney General and district attorneys to investigate certain violations of the Texas Election Code and authorize the Attorney General to request assistance from district attorneys when conducting such investigations. *See* Tex. Elec. Code §§ 273.001, 273.002, 273.022. Although these provisions may be relevant for standing, *see Speech First*, 979 F.3d at

---

[12] We do not resolve whether statements made during the course of litigation about future behavior, by themselves, are sufficient to insulate state officials from *Ex parte Young*'s exception to sovereign immunity. For our purposes here, it is enough to say that Ogg's promise not to enforce the challenged election code provisions provides further evidence that she is not a proper *Ex parte Young* defendant.

[13] To the extent Ogg reneges on her promise, the Plaintiffs may be able to amend their complaint to reassert their constitutional claims and overcome sovereign immunity because "claims barred by sovereign immunity are dismissed without prejudice." *Block v. Tex. Bd. of L. Exam'rs*, 952 F.3d 613, 620 (5th Cir. 2020) (quotation marks and citation omitted).

No. 22-50732

330–31, they provide no support for the Plaintiffs' contentions within the context of our enforcement connection analysis.

First, as noted, our focus is on Ogg's actions, not on those of other officials. Second, the Plaintiffs' arguments not only assume the Attorney General and Secretary of State will attempt to influence Ogg, but also assume she will be influenced. The *Stephens* court explained that the Texas constitution "mandates a vertical separation of powers between the Attorney General and the district attorneys in matters of criminal prosecution." *Stephens*, 663 S.W.3d at 50. It would violate this separation of powers for the Attorney General and Secretary of State to exercise undue influence over Ogg's prosecutorial discretion. *Id.* We will not presume such a violation.

The Plaintiffs thus have not shown Ogg has demonstrated a willingness to enforce the contested election code provisions.

## C.    *Ogg's compelling or constraining the Plaintiffs*

To determine whether an official has a sufficient connection to the challenged statute, we analyze what "enforcement" means in the context of that statute. *City of Austin*, 943 F.3d at 1000. "Panels in this circuit have defined 'enforcement' as 'typically involv[ing] compulsion or constraint.'" *Id.* (alteration in original) (quoting *K.P.*, 627 F.3d at 124). Although there may be many officials involved in enforcing a statute, "[i]f the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Texas All.*, 28 F.4th at 672.

The Plaintiffs argue "the threat of enforcement by Ogg has constrained Plaintiffs from engaging in activities" that S.B. 1 purports to prohibit "for fear of prosecution." The Plaintiffs assert their members have been deterred from participating in "voter education and [get-out-the-vote] efforts." The Plaintiffs also allege that "they have instructed their members . . . 'not

No. 22-50732

to provide direct, in-person voting assistance'" and are no longer "providing volunteers with food, student stipends, and other incentives that could be construed as illegal 'compensation.'"

Those allegations do not affect our earlier analysis that Ogg has not done or threatened to do anything. We focus our attention on Ogg's actions. *See K.P.*, 627 F.3d at 125; *NiGen*, 804 F.3d at 395. In some cases, it is difficult to determine whether a state official's role in enforcing a challenged statute amounts to "compulsion" or "constraint." For example, in one decision, we analyzed whether the Texas Commissioner of Insurance and the Texas Commissioner of Workers' Compensation "enforced" the Texas Workers' Compensation Act that was allegedly preempted by federal law as applied in that case. *Air Evac*, 851 F.3d at 510–11, 519. We held that by setting maximum rates insurers can pay healthcare providers for workers' compensation claims and by arbitrating any fee disputes, the Commissioners "*constrain* Air Evac's ability to collect" what would have been allowed under federal law. *Id.* at 519 (emphasis in original). Conversely, where the official's role in enforcing a statute was merely to train and advise other officials, such acts did not "compel or constrain" anyone to comply with the statute. *Ostrewich*, 72 F.4th at 100–01.

Here, the Plaintiffs allege the existence of the challenged statutes coupled with Ogg's authority to prosecute criminal cases constrained the Plaintiffs because of their fear of prosecution. Although this fear of prosecution may be sufficient for standing, it is insufficient to demonstrate compulsion or constraint under our *Ex parte Young* precedent. Ogg has neither enforced the challenged statute against anyone nor threatened to do so. Ogg has authority to prosecute those that violate the election code; the threat of criminal prosecution may be the pinnacle of compulsion or control. *See Steffel v. Thompson*, 415 U.S. 452, 475 (1974). We have held, however, that "the mere fact that the [state official] *has* the authority to enforce [the challenged statute]

cannot be said to 'constrain'" the party challenging the statute. *City of Austin*, 943 F.3d at 1001 (emphasis in original). Furthermore, to the extent the Plaintiffs argue Ogg's ability to *investigate* election code violations compels or constrains their conduct, that power does not rise to the level of compulsion or constraint needed. *Ostrewich*, 72 F.4th at 101. Thus, the Plaintiffs have failed to demonstrate that Ogg has acted or will likely act in a way that would compel or constrain the Plaintiffs in order to "strip" Ogg of her sovereign immunity. *Id.*

We conclude Ogg is not a proper *Ex parte Young* defendant. We recognize that this may seem contradictory because we often have said "local officials" likely would be proper *Ex parte Young* defendants in the context of other election law cases. *See, e.g.*, *Mi Familia Vota*, 977 F.3d at 468. Nevertheless, a "case-by-case approach to the *Young* doctrine has been evident from the start." *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 280 (1997). We continue that approach today.

The Plaintiffs protest that holding Ogg is an improper *Ex parte Young* defendant "invites an absurd outcome in which no valid officer can be sued to provide relief from constitutional violations." Our holding simply reflects that "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health*, 595 U.S. at 49. The Supreme Court "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court." *Id.* The simple fact is that "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one." *Id.* at 49–50. This is not absurd.

In summary, the guideposts we just considered demonstrate that Ogg is not a proper defendant under *Ex parte Young.*

No. 22-50732

*III.     Pendent appellate jurisdiction to review standing*

Ogg asks us to exercise pendent appellate jurisdiction to review the district court's determination that the Plaintiffs' have standing to bring statutory claims from which she is not immune.  Whether to exercise pendent appellate jurisdiction to address determinations not properly subject to collateral order jurisdiction is a matter of discretion.  *See Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009).  "Beyond the limited right to an interlocutory appeal, the ability to enjoy pendent appellate jurisdiction is carefully circumscribed."  *Escobar v. Montee*, 895 F.3d 387, 391 (5th Cir. 2018).  Pendent appellate jurisdiction may be exercised "(1) [i]f the pendent decision is 'inextricably intertwined' with the decision over which the appellate court otherwise has jurisdiction," or "(2) if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'"  *Id.* (second alteration in original) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)).

Ogg argues we should exercise our discretion here because the significant overlap between standing and our *Ex parte Young* analysis makes the two inextricably intertwined.  Therefore, a review of standing would ensure our review of sovereign immunity is meaningful.  In an unpublished opinion, a previous panel of this court agreed.  *See Williams v. Davis*, No. 22-30181, 2023 WL 119452, at *4 (5th Cir. Jan. 6, 2023).

In deciding whether to follow that panel's course, we first consider that it may be appropriate to exercise pendent appellate jurisdiction if: "(1) the court will decide some issue in the properly brought interlocutory appeal that necessarily disposes of the pendent claim; (2) addressing the pendent claim will further the purpose of officer-immunities by helping the officer avoid trial; (3) the pendent claim would be otherwise unreviewable; or (4) the claims involve precisely the same facts and elements."  *Escobar*, 895 F.3d at 392–93.  Ogg's appeal of the district court's standing determination fits into

none of these categories because (1) our sovereign immunity holding will not necessarily dispose of the issue of standing; (2) addressing standing over claims from which Ogg is not immune will not further the purpose of immunity; (3) standing is otherwise reviewable; and (4) standing and our *Ex parte Young* analysis do not "involve precisely the same facts and elements." *Id.* We have already explained why this is so.

More to the point, the parties' briefing before us and our decision concerning the Plaintiffs' constitutional claims make this an ill-suited case to address standing at this time. The district court relied on a diversion-of-resources theory to find the Plaintiffs had organizational standing against Ogg. That is, the district court found the Plaintiffs sufficiently alleged the challenged provisions of S.B. 1 will force them to divert resources from their ordinary activities to counteract the law's effects, thereby causing them organizational injury. In her briefing before us, Ogg does not even mention the argument. Were this any issue other than standing, we would say that Ogg has forfeited the argument. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 & n.1, 398 (5th Cir. 2021).

Instead of addressing the district court's reasoning on standing, the parties dispute whether the Plaintiffs have associational or organizational standing and whether they or their members are injured by fear of future prosecution.[14] The district court was presented with this basis for standing but made its determination under the diversion-of-resources theory. Thus, although we are mindful of our continuing obligation to assure ourselves of

---

[14] Unlike Ogg, the Plaintiffs mention the actual basis for the district court's standing determination and ask us to affirm on those grounds should we reach the issue. Ogg did not respond to these arguments.

No. 22-50732

jurisdiction, we will not decide the issue on a basis not reached by the district court, especially when the parties do not dispute that basis.

Finally, it may be necessary for the district court to reexamine the issue of standing in light of our decision today. Our holding requires the district court to dismiss the Plaintiffs' constitutional claims against Ogg because she is immune from them. Neither the Plaintiffs' amended complaints nor their briefs provide a clear delineation of how their injuries are attributable to their statutory claims independent of their constitutional claims. This makes an initial decision from our court on the matter particularly questionable. Now that their constitutional claims can no longer be asserted against Ogg, a new determination on standing may be needed. We know the district court will "carefully consider . . . jurisdictional challenges before proceeding to the merits." *Planned Parenthood Gulf Coast*, 24 F.4th at 454.

## CONCLUSION

In summary, jurisdiction exists to consider whether Ogg is immune from certain claims even though immunity is abrogated for others. The Plaintiffs fail to demonstrate an adequate enforcement connection between Ogg and the challenged provisions of S.B. 1 for *Ex parte Young* to apply. We do not reach Ogg's arguments about standing.

REVERSED in part, VACATED in part, and REMANDED.